IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES P. CROSS,

    Petitioner,               No. 2:11-cv-1665 JAM CKD P

    vs.

MARTIN BITER[1],

    Respondent.          ORDER &

                                  FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner, a state prisoner, is proceeding pro se with a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2008 conviction in the Sacramento County Superior Court for conspiracy to murder, distribution of an assault weapon, solicitation to commit murder, and receipt and sale of stolen property, for which he was sentenced to a state prison term of twenty-five years to life plus three years. (Dkt. No. 9 ("Ptn.") at 1.) Respondent has filed an answer to the petition. (Dkt. No. 18.) Upon careful consideration of the record and

---

[1] The court will grant respondent's request to substitute Martin Biter, the current Acting Warden of Kern Valley State Prison, as respondent in this matter. See Stanley v. California Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994) ("A petitioner for habeas corpus relief must name the state officer having custody of him or her as the respondent to the petition."); Rule 2(a), 28 U.S.C. foll. § 2254).

1

the applicable law, the undersigned will recommend that the petition be denied.

## BACKGROUND

In its affirmation of the judgment on appeal, the California Court of Appeal, Third Appellate District, set forth the relevant factual background as follows:

> Stanley Smith has been working as a law enforcement informant on and off since 1990. He has served two prison terms since 1994-one for armed robbery and one for statutory rape. Smith met Placer County Sheriff's Detective Ken Addison in June 2004. Addison wanted Smith to infiltrate the Vagos, an outlaw motorcycle gang. The California Department of Justice defines an outlaw motorcycle gang as "an organization whose members utilize their motorcycle affiliation as a conduit for a criminal enterprise."
>
> Addison and Smith decided that Smith would go to Fast Fridays in Auburn, California, where Vagos members were known to hang out. Fast Fridays is an event where flat track motorbike races are held. When Smith went to his first race, he looked for Vagos jackets, i.e ., motorcycle jackets with the Vagos emblem on the back. Smith saw Cross standing at the fence near the end of the track with another man. Smith approached them and struck up a conversation. Smith told the men he had just gotten out of prison. Cross invited Smith to a bar. At the bar, Smith met defendant Hill, also known as "Boogie," as well as Cross, and sometime later, he also met defendant Matteson, also known as "Pooh." FN1
>
> FN1. The jury was unable to reach a verdict as to Matteson, and the trial court declared a mistrial. Thus, Matteson is not a party to this appeal.
>
> Cross told Smith that the Vagos were recruiting. Cross and Smith discussed ways Smith could make some money. They talked about methamphetamine and stealing Harley Davidsons.
>
> Later, Cross telephoned Smith and told him that he had a stolen 1986 Harley Davidson that he would like to sell, if Smith would be interested. Smith purchased the bike from Cross for $2,000. The money for the purchase came from Detective Addison. Smith took the bike directly to the CHP and told the officers about the transaction.
>
> Sometime later, Cross told Smith he had a brand new Harley, and that he would sell it to Smith for $3,000. Both Cross and Hill were involved in the sale. Smith picked up the motorcycle at Hill's house. Smith paid Cross with funds from Detective Addison and the CHP. Cross gave the money to Hill, who placed it under some clothing in the corner of his garage. Cross told Smith that the bike was stolen.

In mid-September, 2004, Cross and Hill told Smith that they wanted to rob and take $300,000 from someone named Hakala, who was a marijuana dealer living in Auburn. Defendants did not know where Hakala lived, but knew where he was having his Hummer repaired, and told Smith to follow Hakala home from the shop one day. Smith followed Hakala to his home, but at the direction of Detective Addison, told Hill that he lost Hakala's vehicle.

In late September, Smith had a recorded conversation with Hill, during which Hill told Smith that the FBI had informed Hakala of a plot to kill him, and that there was another job that would be "easier and better." Hill told Smith that Cross wanted Smith to go to Cross's house because it was "nothing we can talk about even remotely on the phone."

Smith went to Cross's house. Cross took Smith to his back yard and patted him down. Smith had the recording device in a side pocket, which Cross missed during the search. Cross then told Smith he had somebody for him to "smoke" and that it would pay him "30 G's." The person he wanted killed was Jason Jordan, also known as Wood. During the meeting, Cross told Smith he would give him a machine gun "[o]n top of the 30 G's[.]"

Later, Smith and Hill went to scout out Jordan's residence. Hill gave Smith directions to the apartment building. Hill handed Smith a map to Jordan's home with the address written on it. They also discussed the assault rifle that had been promised to Smith. Smith said he wanted the assault rifle up front. Hill told Smith he would "get on that."

Hill advised Smith in a later telephone conversation that he had acquired the assault rifle. A day or two later, Smith, wearing a wire, went to Hill's house, where Hill gave him the assault rifle.

After the transaction with the assault rifle, Smith was supposed to have a final meeting with defendants at a restaurant to discuss what they were going to do to Jordan. Smith picked up Hill and Hill's young son, and drove them to the restaurant. They all discussed the details of their plan to kill Jordan, and made plans to meet again on Friday morning (October 15, 2004) to begin executing their plans.

Smith and Cross left together to go to Cross's house to pick up the guns Smith would use on Jordan. Cross gave Smith two handguns and some ammunition, which Smith turned over to law enforcement.

On Thursday, October 14, 2004, before the murder plot could be executed, simultaneous search warrants were served on Hill, Cross, and Matteson.

> Both Cross and Hill testified at trial. Cross testified that he was suspicious of Smith from the beginning. He proposed to sell the two stolen motorcycles to Smith as a test, in order to check him out. He knew that Smith was a snitch when he got an angry telephone call from the owner of the bar from which the second motorcycle had been stolen. He nevertheless continued to associate with Smith in order to "feed him a bunch of malarkey so I could really get him tripping on himself." He never asked Smith to harm Hakala, but only to help him locate Hakala's Hummer so that he could steal it. When he found out the FBI had tipped off Hakala to a plot on his life, he knew "[w]ithout a shadow of a doubt, [Smith was] dirty, dirty, dirty, and he's bad news."
>
> Cross testified that when he had frisked Smith at Cross's home, he felt and saw the recording device, and believed it to be a listening device or panic button that would bring law enforcement if Smith needed assistance. Cross nevertheless told Smith about the plan to kill Jordan, just to see what would happen with the information and to trip up law enforcement as much as possible. He picked Jordan because Jordan was one of his very best friends. He did not tell Jordan of the plan, however.
>
> Cross admitted that it was "stupid" to give the guns and ammunition to Smith, but he did it to get "leverage" over Smith. He had the meeting at the restaurant because he wanted to "play this to the bone." He told Hill that the purpose of the meeting was "to feed this guy [Smith] such a big turd he is going to choke on himself."
>
> Hill's testimony generally agreed with Cross's that there was never any intent to harm either Hakala or Jordan. Hill said that he just wanted to leave Smith alone and walk away from him, but Cross wanted to "mess with him[.]"

People v. Cross, 2010 WL 769214, **1-3 (Cal. App. 3 Dist. March 8, 2010); see also Dkt. No. 18 at 25-49 (state court opinion).  The facts as set forth by the state court of appeal are presumed correct.  28 U.S.C. § 2254(e)(1).

      On June 24, 2008, following a jury trial in the Sacramento County Superior Court, a jury found petitioner guilty of the following counts: conspiracy to commit murder (Cal. Penal Code[2] §§ 182 (a)(1)/187); distribution of an assault weapon (§ 12280(a)(1)); solicitation to

---

[2] Unless otherwise designated, statutory references are to the California Penal Code.

4

1  commit murder (§ 653f (b)), and two counts of receipt and sale of stolen property (§ 496(a)).
2  The jury also found true allegations that petitioner was armed with an assault weapon during the
3  commission of the conspiracy offense (§ 12022(a)(2)) and that such offense was committed for
4  the benefit of a criminal street gang (§ 186.22(b)(1)).  The jury also found true an allegation that
5  the solicitation offense was committed for the benefit of a criminal street gang (§ 186.22 (b)(1)).
6  (1 CT 222-224; 2 CT 574-579.)

   On August 15, 2008, petitioner was sentenced to a state prison term of twenty-five years to life for the conspiracy conviction plus an additional three years for the firearm enhancement.  (1 CT 153, 210-213.)  He was also sentenced to a concurrent term of six years for the solicitation conviction, a concurrent five years for the gang enhancement, and a concurrent two years for each of the two stolen property convictions.  The trial court stayed a six-year sentence for the weapon possession conviction.  (Id.)

   Petitioner appealed his conviction and sentence to the California Court of Appeal, Third Appellate District.[3]  (Lod. Docs.[4] 1-3.)  On March 8, 2010, the court of appeal vacated petitioner's five-year sentence for the gang enhancement on the solicitation count, holding that the proper sentence for that enhancement was a term of two, three, or four years.  (Lod. Doc. 4. at 17.)  The court of appeal otherwise affirmed petitioner's conviction and sentence in a reasoned opinion.  (Lod. Doc. 4.)  Petitioner filed a petition for review with the California Supreme Court (Lod. Doc. 5), which was summarily denied on June 30, 2010 (Lod. Doc. 6).

   On July 8, 2011, petitioner filed a federal habeas petition in Case No. 2:11-cv-1801 CKD.  As petitioner had earlier commenced a federal habeas action in Case No. 2:11-cv-1665 JAM CKD (the instant case), the undersigned ordered that the July 8, 2011 petition be re-

---

[3] Respondent notes that petitioner's co-defendant, Ryan Hill, was also party to the appeal. (Dkt. No. 18 at 8, n.5.)

[4] Lodged Documents refer to documents lodged by respondent on June 25, 2012.  (Dkt. No. 19.)

filed in the instant action, and closed the later-filed action.  See Cross v. State of California, No. 2:11-cv-1801 CKD (E.D. Cal.), Dkt. No. 6.  Respondent filed an answer to the petition on June 24, 2012.  (Dkt. No. 18.)

## ANALYSIS

I.  AEDPA

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S. Ct. 770, 785 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Harrington, supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Accordingly, "a habeas court must determine what arguments or theories supported or . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

The undersigned also finds that the same deference is paid to the factual determinations of state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination. A petitioner must show clearly and convincingly that the factual determination is unreasonable. See Rice v. Collins, 546

7

U.S. 333, 338 (2006).

The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19 (2002). Specifically, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, supra, 131 S.Ct. at 786-787. Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court. Wright v. Van Patten, 552 U.S. 120, 125 (2008). Thus, extrapolations of settled law to unique situations will not qualify as clearly established. See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection). The established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. 3, 9 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early, supra, 537 U.S. at 8. Where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

"When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted." Johnson v. Williams, No.

11-465, slip op. at 10, 568 U.S. ____ (Feb. 20, 2013). "When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of the claim. Id., slip op. at 13.

II. Petitioner's Claims

A. Jury Bias

Petitioner claims that the trial court failed to respond to jury requests for assistance in the deliberation process, violating his Sixth and Fourteenth Amendment rights. He asserts that, on two separate occasions, the jury informed the trial court that they would like to discuss their concerns about possible bias in the deliberation process with the judge. Petitioner contends that "presiding Judge Savage had a duty to ensure that all jurors were participating in deliberations without influence by prejudice or bias and no such inquiry was made." (Ptn. at 5.)

In the last reasoned decision on this issue, the Court of Appeal for the Third Appellate District addressed petitioner's claim as follows:

> The jury began deliberations on Thursday morning, June 19. On Friday morning, June 20, the jury sent the following note (request number four) to the court at 10:55 a.m.:
>
> "We the jury in the above entitled cause request the following: 'Assistance in the deliberation process. We would like to see the Judge to discuss concerns regarding the deliberation process. Some jurors feel the process is getting personal and that biases are entering into decision-making'[.]"
>
> A few minutes later, the jury requested a read-back of certain testimony.
>
> After meeting with counsel in chambers, the trial court sent the following response to the jury:
>
> "The court reporter will read the portions of testimony you have requested. The jury may leave at 2:30 p.m. today and return on Monday, June 23 at 9:00 a.m. to resume deliberations. On Monday, if you desire further guidance or clarification regarding issues raised in request # 4, please inform the court."
>
> The court reconvened at 9:00 a.m. Monday morning, and at 11:20 Monday morning, the jury sent the following:

9

"We the jury in the above entitled cause request the following: 'Assistance in the deliberation process. We would like to revisit request # 4 as outlined on Friday....'"

Again, the trial court met and conferred in chambers with counsel, and the following response was sent to the jury:

"The court may not specifically 'assist' a jury with its deliberative process. The jury should refer to the jury instructions which discuss the conduct of the jury generally such as CALCRIM 200 which says in part, the following: 'You must decide what the facts are. It is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial. Do not let bias, sympathy, prejudice or public opinion influence your decision. You must reach your verdict without any consideration of punishment. You must follow the law as I explain it to you, even if you disagree with it.'

Also please refer to CALCRIM 3550 which says in part, the following: 'It is your duty to talk with one another and to deliberate in the jury room. You should try to agree on a verdict if you can. Each of you must decide the case for yourself, but only after you have discussed the evidence with the other jurors. Do no[t] hesitate to change your mind if you become convinced that you are wrong. But do not change your mind just because other jurors disagree with you. Keep an open mind and openly exchange your thoughts and ideas about this case. Please treat one another courteously. Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other.'

If the jury has questions about any specific areas of the law or specific instructions, please inform the court."

This response was sent at 2:00 p.m. on Monday afternoon, and the jury returned with a verdict at 11:30 a.m. the next morning.

Defendants argue the trial court erred by refusing to investigate the jury's concern over biases entering into decisionmaking. They claim this failure resulted in a denial of their rights under the Sixth and Fourteenth Amendments. We disagree.

We conclude defendants forfeited this argument by tacitly consenting to the trial court's response to the jury. In any event, the response was proper.

"[A]s a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal.' [Citation.] This applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights." (In re Seaton (2004) 34 Cal.4th 193, 198.) Where a defendant fails to object to the trial court's

> proposed response to a jury note, he has given tacit approval to the trial court's response, and objection to the response is not preserved for appeal. (People v. Boyette (2002) 29 Cal.4th 381, 430.)  In this case the trial court met with counsel before responding to the jury requests. Defendants asserted no objections to the responses, and thus have forfeited their objections.
>
> In any event, the trial court's response was proper. The decision whether to investigate juror bias or misconduct rests within the sound discretion of the trial court. ( People v. Ray (1996) 13 Cal.4th 313, 343.)  While the trial court is obligated to conduct a hearing into juror bias where good cause exists to doubt a juror's ability to perform his or her duties, the trial court may not remove a juror unless the juror's inability to perform is shown as a "demonstrable reality[.]" (People v. Wilson (2008) 44 Cal.4th 758, 821.) There must be some overt event or circumstance suggesting a likelihood that one or more members of the jury were influenced by improper bias. (In re Hamilton (1999) 20 Cal.4th 273, 294.)
>
> The jury notes at issue here appear to be nothing more than a request by the jury that the trial judge referee deliberations that may have become heated. This clearly would have been improper. There is no specific evidence of bias or taint as to any particular juror or jurors. What some jurors perceived as bias may have been no more than other jurors drawing on their own background when analyzing the evidence. This would not have been improper. " '[I]t is virtually impossible to divorce completely one's background from one's analysis of the evidence' " during jury deliberations. (People v. Wilson, supra, 44 Cal.4th at p. 830.)  Using one's background in analyzing the evidence is appropriate and inevitable. (Ibid.)
>
> The trial court responded to the first note by allowing the jurors to recess for the weekend, no doubt hoping cooler heads would prevail on Monday morning. When the second note was sent, the trial court appropriately told the jury it could not assist with deliberations, and reminded the jury of their duties as individual jurors. This apparently corrected the problem, as no specific report of individual bias was thereafter made, and the jury was able to reach a verdict the next morning. The trial court responded appropriately.

People v. Cross, 2010 WL 769214, **8-10.[5]

---

[5] In the absence of clear evidence to the contrary, the court presumes that the federal claims raised by petitioner on appeal were adjudicated on the merits.  See Johnson v. Williams, No. 11-465, slip op. at 10, 13, 568 U.S. ____ (Feb. 20, 2013); see also Lod. Doc. 1 (petitioner's opening brief on appeal).

As set forth above, before turning to the merits of petitioner's claim, the court of appeal concluded that "defendants forfeited this argument by tacitly consenting to the trial court's response to the jury. . . . In this case the trial court met with counsel before responding to the jury requests. Defendants asserted no objections to the responses, and thus have forfeited their objections." People v. Cross, supra, at *9.

Respondent argues that petitioner's jury bias claim is procedurally barred. Based on concerns of comity and federalism, federal courts will not review a habeas petitioner's claims if the state court decision denying relief relies on a state law ground that is independent of federal law and adequate to support the judgment. See Coleman v. Thompson, 501 U.S. 722 (1991); Harris v. Reed, 489 U.S. 255, 260–62 (1989). However, a discretionary state rule is not adequate to bar federal habeas corpus review. See Siripongs v. Calderon, 35 F.3d 1308 (9th Cir. 1994). Generally, the only state law grounds meeting these requirements are state procedural rules. Even if there is an independent and adequate state ground for the decision, the federal court may still consider the claim if the petitioner can demonstrate: (1) cause for the default and actual prejudice resulting from the alleged violation of federal law, or (2) a fundamental miscarriage of justice. See Harris, 489 U.S. at 262 (citing Murray v. Carrier, 477 U.S. 478, 485, 495 (1986)).

In the instant case, the last reasoned state court decision concluded that petitioner forfeited his jury bias claim by failing to object at trial. Under California law, "[a]n appellate court will not consider claims of error that could have been — but were not — raised in the trial court." People v. Vera, 15 Cal.4th 269, 275–76 (1997). In Rich v. Calderon, 187 F.3d 1064, 1066 (9th Cir. 1999) and Vansickel v. White, 166 F.3d 953 (9th Cir. 1997), the Ninth Circuit held that California's contemporaneous objection rule is an adequate and independent state procedural rule when properly invoked by the state courts. The Ninth Circuit has also concluded that the contemporaneous objection rule has been consistently applied by the California courts. See Fairbanks v. Ayers, 650 F.3d 1243, 1256 (9th Cir. 2011); Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002).

Here, while the court of appeal invoked the contemporaneous objection rule in declaring petitioner's claim forfeited, it went on to alternately consider petitioner's claim on the merits.  In the Ninth Circuit, it is a "well-settled rule that 'the independent state grounds doctrine bars the federal courts from reconsidering the issue in the context of habeas corpus review as long as the state court explicitly invokes a state procedural bar rule as a separate basis for its decision.'"  Fairbank v. Ayers, 650 F.3d 1243, 1256 (9th Cir. 2011), citing Jackson v. Giurbino, 364 F.3d 1002, 1006 (9th Cir. 2004).  See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding.  By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.")  (Italics in original.)

Petitioner has not demonstrated cause and prejudice or a fundamental miscarriage of justice such as would allow the court to consider this procedurally defaulted claim.  As a result, the undersigned concludes that this claim is barred.

Even if petitioner's claim were not barred, it lacks merit.  The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors. U.S. Const. amend. VI; see Irvin v. Dowd, 366 U.S. 717, 722 (1961).  "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." Tinsley v. Borg, 895 F.2d 520, 523–24 (9th Cir.1990) (internal quotations omitted).

However, the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation."  Smith v. Phillips, 455 U.S. 209, 217 (1982).  Rather, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  Id.  When allegations of juror misconduct or bias arise, the trial court must determine the circumstances, the impact on the jurors, and whether the conduct was prejudicial.  Remmer v. United States, 347 U.S. 227,

229–30 (1954).

Juror bias is a question of historical fact; that is, bias turns on what the juror said and did and whether the juror's statement that he or she could be impartial was credible. <u>Patton v. Yount</u>, 467 U.S. 1025, 1036 (1984). In order to receive relief based on a factual determination, petitioner must show that the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Here, the state court concluded there was "no specific evidence of bias or taint as to any particular juror or jurors." The state court further observed that, while the trial judge declined to "assist" the jury, he reminded jurors of their duty to be impartial and not unduly influenced by others. Petitioner cites no evidence that any juror failed to fulfill his or her duty to be impartial. As the state court's decision was not objectively unreasonable in light of the evidence presented, petitioner's claim fails on the merits.

B. <u>Instructional Error</u>

Petitioner next claims that the trial court committed "constitutional error when it modified the entrapment instruction" as described below. Petitioner claims that the modified instruction restricted his defense of entrapment by a confidential informant "to only two types of conduct, thus increasing the defense burden to prove that defense." (Ptn. at 7.) Petitioner further argues that his attorney's assent to the instruction violated petitioner's right to effective assistance of counsel. (<u>Id</u>.)

The state court of appeal addressed this claim as follows:

> The trial court gave an instruction on the defense of entrapment.FN5 The instruction was a modified version of CALCRIM No. 3408, and the pertinent parts of the instructions were:
>
> FN5. No reporter's transcript of the jury instructions appears in the record. We quote the written instruction from the clerk's transcript.
>
> "A person is entrapped if a law enforcement officer or his agent

14

engaged in conduct that would cause a normally law-abiding person to commit the crime.

Some examples of entrapment might include conduct like badgering, persuasion by flattery or coaxing, repeated and insistent requests, or an appeal to friendship or sympathy.

Another example of entrapment would be conduct that would make commission of the crime unusually attractive to a normally law-abiding person. Such conduct might include a guarantee that the act is not illegal or that the offense would go undetected, an offer of extraordinary benefit, or other similar conduct.

If an officer or his agent simply gave the defendant an opportunity to commit the crime or merely tried to gain the defendant's confidence through reasonable and restrained steps, that conduct is not entrapment.

*The use of a confidential informant to expose illicit activity does not, by itself, constitute entrapment, so long as no pressure or overbearing conduct is employed by the informant.*

In evaluating this defense, you should focus primarily on the conduct of the officer. However, in deciding whether the officer's conduct was likely to cause a normally law-abiding person to commit this crime, also consider other relevant circumstances, including events that happened before the crime, the defendant's responses to the officer's urging, the seriousness of the crime, and how difficult it would have been for law enforcement officers to discover that the crime had been committed.

When deciding whether the defendant was entrapped, consider what a normally law-abiding person would have done in this situation. Do not consider the defendant's particular intentions or character, or whether the defendant had a predisposition to commit the crime.

As used here, an agent is a person who does something at the request, suggestion, or direction of an officer. It is not necessary that the agent know the officer's true identity, or that the agent realize that he or she is actually acting as an agent."

The italicized paragraph represents the trial court's addition to the standard jury instruction. Defendants argue that by adding the italicized language, the trial court conveyed that the only means of entrapment by an informant were "pressure or overbearing conduct." They argue this improperly increased their burden to prove the defense of entrapment.

"Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice

> under People v. Watson (1956) 46 Cal.2d 818 [299 P.2d 243]." [Citation omitted.]
>
> The trial court informed the parties it had included the paragraph regarding confidential informants as a variation on the use note for the standard instruction, and asked defendant Cross's counsel if he had any objection to the inclusion of the paragraph. Cross's counsel replied: "I do not, your Honor. I reviewed it after the Court informed me of it. I went back and looked at the use note, actually looked it up, and no, I think it is on point. It is accurate for our case and it should be included." The trial court asked if any other counsel wished to make a comment. Hill's counsel replied, "No." Defendants have thus forfeited any objection on appeal.
>
> Because defendants also claim their counsels' failure to object resulted in ineffective assistance of counsel, we consider the merits of their contention on appeal. We find no error in the court's instruction.
>
> In Provigo Corp. v. Alcoholic Beverage Control Appeals Bd. (1994) 7 Cal.4th 561, 568, the court stated, "[a]s a general rule, the use of decoys to expose illicit activity does not constitute entrapment, so long as no pressure or overbearing conduct is employed by the decoy." Thus, the trial court's addition to the instruction was a correct statement of the law.
>
> Furthermore, we conclude no reasonable juror would have understood the instruction to limit the conduct constituting entrapment when a confidential informant, rather than a law enforcement officer is involved. The instruction told the jury that entrapment could be instigated by a law enforcement officer "or his agent[.]" A confidential informant is, pursuant to the definition given in the instruction, an agent of law enforcement. The instruction gave examples of conduct constituting entrapment, including badgering, persuasion by flattery or coaxing, repeated and insistent request, appeals to friendship or sympathy, and conduct that would make commission of the crime unusually attractive to a normally law-abiding person. Taken as a whole, no reasonable juror could have understood the instruction to mean that conduct which would otherwise constitute entrapment if performed by an agent of law enforcement, would not constitute entrapment if performed by a confidential informant.

People v. Cross, 2010 WL 769214, **10-11.

As with the previous claim, the state court of appeal concluded that petitioner forfeited this claim by failing to contemporaneously object. (Id. at *11.) Thus, absent a showing of cause and prejudice or a fundamental miscarriage of justice, this claim is procedurally barred.

16

See Harris, supra, 489 U.S. at 262 ("[A]n adequate and independent findings of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto' . . . or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'"), citing Murray v. Carrier, 477 U.S. 478, 485 (1986).

In this context, the court considers petitioner's argument that his trial counsel was ineffective for failing to object to the modified instruction on entrapment. The test for demonstrating ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688. To this end, the petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. Id. at 690. Second, a petitioner must affirmatively prove there is a "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 693-694.

Here, petitioner has not shown that his trial counsel's conduct was objectively unreasonable. The state court of appeal came to the same conclusion as petitioner's counsel: The added entrapment language was an accurate statement of California law. An attorney is not required by the Constitution to make an objection he or she knows will be futile. Thus petitioner has not shown "cause and prejudice" for his attorney's failure to object to the entrapment language. Nor has he shown a fundamental miscarriage of justice.

Even if petitioner's claim were not procedurally barred, it lacks merit. "[F]ederal habeas corpus relief does not lie for errors of state law." Estelle v. McGuire, 502 U.S. 62, 67 (1991). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Id. at 68. To obtain federal habeas relief for instructional error, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See id. at 72. The

instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See id. In reviewing a faulty instruction, the court inquires whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. Id. at 72, n. 4.

In this case, the challenged instruction did not violate petitioner's right to due process. The state court of appeal determined that the language at issue was a correct statement of California law and that "no reasonable juror" would have understood it to heighten the burden of proof for the entrapment defense as petitioner claims. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (Supreme Court "has repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.")  In doing so, the state court properly considered the challenged instruction in the context of the accompanying instructions, see Estelle, supra, 502 U.S. at 72, and its conclusion does not offend clearly established Supreme Court precedent. Thus petitioner's claim should be alternatively denied on the merits.

Accordingly, IT IS HEREBY ORDERED THAT the Clerk of Court shall substitute Martin Biter as respondent in this matter.

IT IS HEREBY RECOMMENDED THAT:

1. The petition (Dkt. No. 9) be denied; and

2. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. See Rule 11, Federal Rules Governing Section 2254 Cases (the district

court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant). Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: April 10, 2013

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

2
cros1665.hc